**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **RAYMOND URBANSKI,** | |
| **Plaintiff,** | **Civil Action No.: 22-2650 (ES) (LDW)** |
| **v.** | **OPINION** |
| **PORT AUTHORITY TRANS-HUDSON CORPORATION,** | |
| **Defendant.** | |

**SALAS, DISTRICT JUDGE**

Before the Court is Defendant Port Authority Trans-Hudson Corporation's ("PATH") Motion for Summary Judgment ("Motion"). (D.E. No. 26). That Motion is fully briefed. (*See* D.E. No. 26-2 ("Mov. Br."), D.E. No. 27 ("Opp. Br.") & D.E. No. 32 ("Reply Br.")). The Court has carefully considered the parties' submissions, as well as the balance of the record, and decides the matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, the Court will **GRANT** PATH's Motion.

## I.    BACKGROUND[1]

At all relevant times, Plaintiff worked for PATH at its "Harrison Yard" location in Harrison, New Jersey. (D.E. No. 1 ("Compl.") ¶ 14). Around noon on May 6, 2020, Plaintiff began feeling "a little under the weather," with symptoms including fatigue, a slight cough, and a headache. (PATH SOMF ¶ 9). Plaintiff nonetheless reported to his shift, which was scheduled

---

[1]    Unless otherwise noted, the Court has drawn the background described herein from the properly supported paragraphs in PATH's Statement of Material Facts (D.E. No. 26-1 ("PATH SOMF")), that Plaintiff either admitted or failed to properly rebut in his responsive Statement, (D.E. No. 28 ("Pl. Answer to SOMF")).

for 11:00 p.m. that evening through 7:00 a.m. the following morning. (*Id.* ¶ 13). Early on in that shift, Plaintiff spoke with his co-worker, Jesus Isla, who informed Plaintiff that he and his mother had tested positive for COVID-19. (*Id.* ¶¶ 13–14). Mr. Isla testified that, during that interaction, he told Plaintiff that PATH was aware of the situation and had cleared him to return to work. (*Id.* ¶ 15). Plaintiff does not recall Mr. Isla making that representation. (D.E. No. 30-2 at 14 (ECF pagination) ("Q: Did Mr. Isla ever tell you that he had been cleared by PATH to return? A: No."); D.E. No. 26-7 at 18 (ECF pagination) ("Q: . . . Do you not remember one way or another, or you know he never told you that? A: I don't believe he ever told me that. But then again, one can assume that he was cleared by PATH because he was back to work.")). At the time of his interaction with Plaintiff, Mr. Isla did not have any COVID-19 related symptoms. (PATH SOMF ¶ 20). Indeed, Mr. Isla had not had such symptoms since returning to work in late April 2020. (*Id.* ¶ 19).

After his interaction with Mr. Isla, Plaintiff went on to work his entire shift, without calling off duty. (PATH SOMF ¶ 10). At some point during his shift, Plaintiff called his supervisor, Mr. Raymond Bing. (*Id.* ¶ 23). Plaintiff advised Mr. Bing of his interaction with Mr. Isla. (D.E. No. 26-7 at 21 (ECF pagination) (Q: "What did you say to him about your interaction with Mr. Isla? A: I told him that he told me he had tested positive for COVID-19."). In the same conversation, Plaintiff asked Mr. Bing if he could be on "standby" for the following week,[2] as that would allow him to "take care of things" or "get things done" in his personal life. (PATH SOMF ¶ 24; D.E. No. 26-8 at 6 (ECF pagination); D.E. No. 26-7 at 22 (ECF pagination) ("I said, hey, listen, wouldn't

---

[2] As one PATH employee testified regarding the "standby" arrangement: "So during the pandemic, we were rotating shifts for some of the BRS that they would have a week on and a week off, on call." (D.E. No. 26-8 at 9–10 (ECF pagination)). Plaintiff was, therefore, asking for a modification of his schedule whereby he would still be working (i.e., not taking vacation time), but allowed to be "on call" (i.e. not reporting to the Harrison Yard site in person unless necessary). (*Id.* at 10 (ECF pagination)).

it be nice to have a week off and get things done.")).  Mr. Bing informed Plaintiff that he would relay that request to his own supervisor, Brian Hodgkinson.  (PATH SOMF ¶ 28).  Mr. Bing did so, stating "something to the effect that, 'Well, . . . Mr. Urbanski has something to do and it's easier if he does it when he's off.'"  (*Id.* ¶ 30; D.E. No. 26-8 at 9 (ECF pagination)).  Mr. Hodgkinson denied that request (PATH SOMF ¶ 29), and Mr. Bing conveyed the response to Plaintiff by email at approximately 6:45 a.m. on May 7, 2020.  (*Id.* ¶ 31).

Several hours later, Plaintiff called PATH's COVID-19 hotline.  (*Id.* ¶ 32; Pl. Answer to SOMF ¶ 32).  During that call, Plaintiff advised:

> Jesus Isla came back from quarantine that tested positive for COVID-19 and has been sharing a [locker room] with [Plaintiff]. [Plaintiff] started getting headaches, couch [sic] and diarrihea [sic].
>
> Co-worker (Jesus Isla) told [Plaintiff] that he tested positive; [Plaintiff] has a wife with asthma and a daughter with medical issues.  Wanted guidance as to what to do next.

(D.E. No. 26-15 at 2 (ECF pagination); PATH SOMF ¶ 33; Pl. Answer to SOMF ¶ 33).  PATH's COVID-19 hotline referred Plaintiff to his own medical team.  (PATH SOMF ¶ 34).  "Plaintiff called his treating physician, who asked him if he thought he was in contact with somebody who was positive with COVID-19" (*id.*), and Plaintiff responded:  "They actually told me they had tested positive."  (*Id.*; D.E. No. 26-12 at 8 (ECF pagination)).  Plaintiff thereafter called the PATH's COVID-19 hotline again about an hour later, advising that he was able to take a COVID test, that he expected to have his results within the next few days, and that his doctor advised him to self-quarantine in the interim.  (PATH SOMF ¶ 35; D.E. No. 32-2 at 1–2 (ECF pagination)).

In a note dated May 7, 2020, Whitehall Expresscare advised that Plaintiff was "recently evaluated for an upper respiratory infection" and asked that he be excused from work.  (D.E. No. 26-18).  The same note further provided, in relevant part:  "The current CDC guidelines

3

recommend that individuals with upper respiratory infection symptoms, who are being tested for COVID-19, be directed to care for themselves at home and self isolate until test results are available and further instructions are provided." (*Id.*).  In a note dated May 8, 2020, Lehigh Valley Health Network advised that Plaintiff "had a negative test for COVID-19 infection" and further stated:  "Please excuse from work until the patient is symptom free.  If the patient has had close contact to someone with COVID-19 infection, they will still need to maintain a home quarantine for 14 days from their last exposure."  (D.E. No. 26-19).[3]  Plaintiff called PATH's COVID-19 hotline on Monday, May 11, 2020, to extend his absence.  (PATH SOMF ¶ 35).  During that call, Plaintiff advised that he had received the results of his COVID-19 test on May 10, 2020, and that his doctor had advised him to remain in quarantine for 14 more days in light of his upper respiratory infection and because he was in contact with someone who tested positive.  (PATH SOMF ¶ 52; D.E. No. 26-15).  The representative from PATH's COVID-19 hotline advised Plaintiff to continue his self-quarantine "until confirmation from [PATH's Office of Medical Services]/HR."  (PATH SOMF ¶ 54; D.E. No. 26-15).

When Mr. Hodgkinson learned that Plaintiff had called out, he found it suspicious, given that Plaintiff did so shortly after PATH denied his request to be on an alternate "standby" schedule. (PATH SOMF ¶ 39).  Mr. Hodkinson testified that he finds it suspicious "every time" an employee calls out sick after making an unsuccessful request for time off.  (*Id.* ¶ 41; D.E. No. 26-8 at 14 (ECF pagination)).  Mr. Hodgkinson notified his supervisor, Gregory Gadomski, of the situation. (PATH SOMF ¶ 39).  Mr. Gadomski likewise found the circumstances suspicious, and thus

---

[3]     The May 8, 2020 note contains a notation reflecting that Plaintiff first viewed it on May 11, 2020 at 3:24 p.m.  (*Id.*).  Though not material to the resolution of PATH's Motion, the record is unclear as to when Plaintiff first received actual notice of his negative result.  (*Compare* D.E. No. 26-8 at 30 (ECF pagination) ("They had called me the next day and told me that . . . I tested negative."), *with id.* at 27 (ECF pagination) ("It could have been Saturday morning, the 9th.  It could have been Saturday morning, Friday evening.").

dispatched an investigator to surveil Plaintiff. (*Id.* ¶ 43). On May 10, 2020, an investigator witnessed Plaintiff leaving his home in the early afternoon and returning with groceries. (*Id.* ¶ 58). The following morning, the investigator recorded Plaintiff going to a tire store to get his tires replaced. (*Id.* ¶ 59). On May 12, 2020, surveillance revealed that Plaintiff again went to the tire store and the grocery store. (*Id.* ¶ 61).

Dr. Howard Fisher, the head of PATH's Office of Medical Services, viewed the investigator's surveillance videos and concluded that, from a medical perspective, Plaintiff's actions were not consistent with a quarantine. (PATH SOMF ¶¶ 56 & 62–63). By Amended Notice of Investigation dated June 1, 2020, PATH charged Plaintiff with violations of Rule E.1 and J.4 of the PATH Book of Rules. (PATH SOMF ¶ 64; D.E. No. 26-21). That Amended Notice stated, in relevant part:

> More specifically, on May 13, 2020 PATH was notified that you acted with indifference and neglect, and committed a dishonest act when you were observed engaged in activities and behaviors on May 10, 2020; May 11, 2020 and May 12, 2020, that were inconsistent with the representation you made to the PATH COVID19 Hotline and the direction set forth in a the Doctor's note you provided to PATH Office of Medical Services.
>
> More specifically, on May 13, 2020 PATH was notified that you acted with indifference and neglect and committed a dishonest act when you were observed engag[ing] in activities and behaviors on May 11, 2020 and May 12, 2020 that were inconsistent with the representation you made to PATH staff when you called off from work in 'quarantine' status.
>
> More specifically, on May 13, 2020 PATH was notified that you made a false report of illness in connection with your report off from service on May 10, 2020, May 11, 2020 and May 12, 2020. More specifically, that you committed a dishonest act when you accepted sick compensation under false pretense on May 11, 2020 and May 12, 2020.

(D.E. No. 26-21). PATH based those charges upon Dr. Fisher's determination that Plaintiff "was not following the COVID-19 protocols of PATH and the Port Authority as it related to him going

5

out to the automotive store with his vehicle." (PATH SOMF ¶¶ 65–67). After he was charged, Plaintiff provided PATH with a doctor's note, dated June 2, 2020, which stated, in pertinent part: "test completed on 5/7/20 and resulted negative on 5/8/20. Patient remained symptom free throughout quarantine and was able to run essential errands during this time." (PATH SOMF ¶ 69).

On June 24, 2020, PATH conducted a hearing on the charges against Plaintiff. PATH SOMF ¶ 69 & 71). By letter dated July 10, 2020, the hearing officer, Ferdinand Frollani, found Plaintiff guilty of those charges. (PATH SOMF ¶ 72; D.E. No. 26-24). In reaching that decision, Mr. Frollani wrote, in relevant part: "video evidence of your actions on May 10, 11 and 12, 2020, contradicted a medical record dated May 8, 2020, and your representation to the Port Authority COVID Hotline on May 11, 2020, wherein you indicated that you were calling off from work for purposes of 'quarantine.'" (PATH SOMF ¶ 73; D.E. No. 26-24). Mr. Frollani ultimately suspended Plaintiff for 30 days, 16 of which were already served, with the remaining 14 held in abeyance for one year. (PATH SOMF ¶ 75).

Plaintiff appealed Mr. Frollani's July 10, 2020 decision in accordance with the operative collective bargaining agreement. (Id. ¶ 78). During a hearing on that appeal, Mr. Frollani expressed his belief that Plaintiff told PATH's COVID-19 hotline one thing (i.e., that he was symptomatic) and told his own medical provider something different (i.e., that he remained symptom free throughout his quarantine period). (Id. ¶ 76; D.E. No. 26-12 at 4 (ECF pagination)). The hearing officer, Kevin Lejda, ultimately upheld Plaintiff's suspension (PATH SOMF ¶ 79), finding, in relevant part:

> With respects to merit, it is clear from evidence of record that Mr. Urbanski engaged in activities and behaviors on May 10, 2020, May 11, 2020 and May 12, 2020, that were inconsistent with a quarantine protocol. Furthermore, in view of the fact that the doctor's note

> dated June 2, 2020, applies a retroactive assessment of permissible
> action, . . . it cannot excuse Mr. Urbanski's activities and behaviors
> prior to the closure of his quarantine period.

(D.E. No. 26-25 at 3 (ECF pagination); SOMF ¶ 80).

On September 9, 2020, Plaintiff filed a charge with the Occupational Health and Safety Administration ("OSHA"), alleging that PATH violated the Federal Rail Safety Act ("FRSA") by taking an adverse action against him in response to his reporting, in good faith, a hazardous safety or security condition. (PATH SOMF ¶ 79; D.E. No. 26-4). When later testifying about his OSHA charge, Plaintiff explained that the "hazardous safety or security condition" underlying that claim was that he "was in close contact with somebody that told [him] they tested positive for COVID-19." (PATH SOMF ¶ 5; D.E. 26-7 at 30 (ECF pagination)). OSHA ultimately found that PATH did not violate the FRSA. (PATH SOMF ¶ 2).

## II. PROCEDURAL HISTORY

Plaintiff commenced this action against PATH on May 5, 2022, asserting a single cause of action for violation of 49 U.S.C. § 20109(b)(1)(a). Fact discovery closed on or about March 31, 2023. (D.E. No. 12). After the parties' efforts to settle the case proved unsuccessful, PATH filed its Motion on June 7, 2024. (D.E. No. 26). Plaintiff filed his opposition materials on June 17, 2024 (D.E. Nos. 27–31), and PATH filed its reply on June 24, 2024, (D.E. No. 32).

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate if the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if it is supported by evidence such that a reasonable jury could find the fact in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

7

242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

If the party seeking summary judgment makes this showing, the non-moving party must then "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2002) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).  The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the nonmoving party.  *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  Finally, in deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

### B.    The Federal Rail Safety Act

"[FRSA] was passed 'to promote safety in every area of railroad operations.'"  *Maxwell v. Port Auth. Trans Hudson Corp.*, No. 21-1040, 2024 WL 3064691, at *6 (D.N.J. June 20, 2024) (citing 49 U.S.C. § 20101).  "In 2007, the FRSA was amended to include anti-retaliation measures, which 'expand[ed] the scope of the anti-retaliation protections and provid[ed] enforcement authority with the Department of Labor.'"  *Id.* (quoting *Araujo v. N.J. Transit Rail Operations,*

8

*Inc.*, 708 F.3d 152, 156 (3d Cir. 2013)).  The FRSA, as amended, provides whistleblower protection for a variety of activities, which "are enumerated in the statute, and include notifying the railroad carrier of a work-related personal injury or a work-related illness." *Araujo*, 708 F.3d at 157.

Plaintiff asserts a single cause of action under the FRSA.  (*See generally* Compl.).  PATH characterizes Plaintiff's claim as being premised on 49 U.S.C. § 20109(b)(1)(a), (Mov. Br. at 5), and Plaintiff does not suggest otherwise.  (*See generally* Opp. Br.).[4]  That provision states, in relevant part:  "A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . reporting, in good faith, a hazardous safety or security condition."  49 U.S.C. § 20109(b)(1)(a).

"To prevail on a FRSA retaliation claim, an employee must demonstrate that '(1) []he engaged in protected activity; (2) the employer knew that []he engaged in the protected activity; (3) []he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'"  *Maxwell*, 2024 WL 3064691, at *6 (quoting *Araujo*, 708 F.3d at 157).  Plaintiff must do so by a preponderance of the evidence.  *Araujo*, 708 F.3d at 157.  "Once the plaintiff makes a showing that the protected activity was a 'contributing factor' to the adverse employment action, the burden shifts to the employer to demonstrate 'by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.'"  *Id.* (citation omitted).  Any employer seeking to do so faces a "steep burden."  *Id.* at 162.

---

[4]     Indeed, Plaintiff based his OSHA charge on PATH's alleged violation of that statute.  (D.E. No. 26-4).

## IV.    DISCUSSION

PATH argues that Plaintiff's FRSA claim fails in multiple regards. (*See generally* Mov. Br.). Most fundamentally, PATH argues that Plaintiff did not act in good faith when he reported Mr. Isla's COVID-19 status as a hazardous safety condition, such that Plaintiff did not engage in protected activity under 49 U.S.C. § 20109(b). (Mov. Br. at 8–10; Reply Br. at 8–9). PATH further argues: (i) Plaintiff's FRSA claim fails because Mr. Isla did not, in fact, constitute a hazardous safety condition (Mov. Br. at 1–4); (ii) FRSA does not apply because COVID-19 is not a railroad-specific hazard (*id.* at 4–6); (iii) Plaintiff cannot demonstrate that PATH officials "knew" he engaged in a protected activity, as the relevant decision makers knew Mr. Isla had been cleared and, therefore, did not present a safety hazard (*id.* at 6–8); (iv) Plaintiff cannot establish the necessary causation for his FRSA claim (*id.* at 10–11); and (v) it has shown, by clear and convincing evidence, that it would have disciplined Plaintiff even in the absence of any protected activity, (*id.* at 11–17). The Court begins its analysis with the first and most basic of those arguments.

### A.    Plaintiff Did Not Report a Hazardous Safety Condition in Good Faith

49 U.S.C. § 20109(b)(1)(A) prohibits railroad carriers from retaliating against employees for "reporting, in good faith, a hazardous safety or security condition[.]" Inherent in the statutory language is the limitation that reports are only protected when an employee makes them in good faith. The Court is unaware of any case law from this Circuit specifically interpreting the provision's "good faith" reporting requirement. The United States Court of Appeals for the Second Circuit, however, has held that "a railroad employee engages in protected activity under § 20109(b)(1)(A) when she reports what she subjectively believes to be a hazardous safety or security condition irrespective of whether that understanding is objectively reasonable." *Ziparo v.*

*CSX Transportation, Inc.*, 15 F.4th 153, 163 (2d Cir. 2021).[5]  In making that determination, the Second Circuit observed:  "'[G]ood faith' requires that the employee actually believe that the facts [h]e is reporting are true and do indeed constitute a hazardous safety or security condition, and that the employee did not make the report for an improper purpose."  *Id.* at 163.  Given the plain language of 49 U.S.C. § 20109(b)(1)(a), this Court adopts the Second Circuit's sound interpretation of the provision's "good faith" requirement.  Thus, a factfinder would have to determine whether Plaintiff genuinely believed that his May 6, 2020 exposure to Mr. Isla constituted a hazardous safety condition at the time he called PATH's COVID-19 hotline the following day.  Having carefully considered the undisputed material facts established in the motion record in the light most favorable to Plaintiff, the Court determines that no reasonable juror could find, by a preponderance of the evidence, that Plaintiff did so.

First, the Court examines the undisputed evidence concerning Plaintiff's pre-report knowledge and understanding of Mr. Isla's status.  While Mr. Isla informed Plaintiff that he had tested positive for COVID-19, he did not specify when, and the two men never explicitly discussed whether Mr. Isla remained contagious in the course of their brief interaction.  (*See* D.E. No. 26-8 at 29 (ECF pagination) (Plaintiff testified:  "All I know is he told me that he tested positive for COVID-19", and that he did not know whether Mr. Isla "was currently infected or previously infected.").  Plaintiff testified that he had "no idea what [Mr. Isla] meant," but "took it as there is a possibility this guy could have COVID right now."  (D.E. No. 26-7 at 17 (ECF pagination)).  Mr. Isla testified that, during his interaction with Plaintiff, he told Plaintiff that PATH was aware of the situation and had cleared him to return to work.  (Pl. SOMF ¶ 15).  While Plaintiff did not

---

[5]      *Cf. Ray v. Union Pac. RR. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013) (noting that in the context of a claim under 49 U.S.C. § 20109(a)(4), a FRSA provision that requires an employee to act in good faith when reporting a work-related injury or illness, one district court determined that "the relevant inquiry [is] whether, *at the time he reported his injury to [d]efendant*, [p]laintiff genuinely believed the injury he was reporting was work-related").

11

recall such a discussion, he testified that he nevertheless assumed PATH had cleared Mr. Isla because he had returned to work—the very place where Plaintiff had the discussion at heart of this dispute:

> Q: I just want to be clear. You said you do not remember him telling you that PATH cleared him. I want to drill down on that. Do you not remember one way or another, or you know he never told you that?
>
> A: I don't believe he ever told me that. But then again, one can assume that he was cleared by PATH because he was back to work. **So you would have to be a complete idiot not to believe that he was cleared by PATH**. I mean, come on, let's just be sensible here.

(D.E. No. 26-7 at 18 (ECF pagination) (emphasis added); *see also id.* at 20 (ECF pagination) ("Q: What's throwing me off is you keep saying one could make that assumption. My question is: Did you make that assumption? A: Sure. You're not coming back to work without PATH clearing you.")). Thus, the evidence reflects Plaintiff's contemporaneous understanding that (i) PATH was aware of Mr. Isla's situation; and (ii) PATH had nevertheless cleared Mr. Isla to return to work.

Second, the Court considers the timing of Plaintiff's call to PATH's COVID-19 hotline. While Plaintiff informed his supervisor, Mr. Bing, of his interaction with Mr. Isla shortly after it occurred, he did so in connection with his request to work on a "stand by" schedule the following week, so that he could accomplish personal tasks near his home. (PATH SOMF ¶¶ 23–24; D.E. No. 26-8 at 6 (ECF pagination); D.E. No. 26-7 at 22 (ECF pagination)). When Plaintiff later contacted the COVID-19 hotline, it was not until *after* he had completed his entire shift, and *after* Mr. Bing advised that PATH had denied his request for a "stand by" schedule modification. (PATH SOMF ¶¶ 10, 31–33).

Finally, the Court finds that Plaintiff's post-report activity is probative of the good faith issue. Specifically, Plaintiff failed to follow his own medical provider's instructions for patients who believed they had been in contact with a person infected with COVID-19. Plaintiff's May 7,

12

2020 doctor's note, which asked that Plaintiff be excused from work in light of his upper respiratory infection, also stated: "The current CDC guidelines recommend that individuals with upper respiratory infection symptoms, who are being tested for COVID-19, be directed to care for themselves at home and self isolate until test results are available and further instructions are provided." (D.E. No. 26-18). Those "further instructions" came the next day in a note from Lehigh Valley Health Network advising that Plaintiff "had a negative test for COVID-19 infection" and further stating: "Please excuse from work until the patient is symptom free. If the patient has had close contact to someone with COVID-19 infection, they will still need to maintain a home quarantine for 14 days from their last exposure." (D.E. No. 26-19). Plaintiff certainly read that language, as it served as the basis for his May 11, 2020 call to the PATH COVID-19 hotline extending his absence. (PATH SOMF ¶¶ 35, 52 & 54; D.E. No. 26-15). Nevertheless, Plaintiff did not maintain a home quarantine, as the undisputed record reflects that he went grocery shopping and to the tire store the very next day. (PATH SOMF ¶ 61).

Taking these undisputed facts together, the Court concludes that no reasonable juror would find, by a preponderance of the evidence, that Plaintiff sincerely believed Mr. Isla represented a hazardous safety condition at the time of their May 6, 2020 locker room interaction.

### B.    PATH Would Have Disciplined Plaintiff in the Absence of a Protected Activity

Even if the Court were to assume, for the sake of argument, and for the purposes of this motion only, that Plaintiff established a *prima facie* case of FRSA retaliation, summary judgment would still be appropriate. As noted above, "[o]nce the plaintiff makes a showing that the protected activity was a 'contributing factor' to the adverse employment action, the burden shifts to the employer to demonstrate 'by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.'" *Araujo*, 708 F.3d at 157

13

(citation omitted).   Analyzing the same burden-shifting framework in the context of another, unrelated statute, the United States Supreme Court provided the following guidance for this step of the analysis:

> The statute's burden-shifting framework provides that an employer will not be held liable where it "demonstrates, by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of" the protected behavior.   The right way to think about that kind of same-action causation analysis is to "change one thing at a time and see if the outcome changes."   The question is whether the employer would have "[disciplined] an otherwise identical employee" who had not engaged in the protected activity.

*Murray v. UBS Sec., LLC*, 601 U.S. 23, 38 (2024) (citations omitted).

The Court has already recounted, at length, the undisputed facts concerning the charges PATH raised against Plaintiff, the basis for those charges, and PATH's rationale for disciplining Plaintiff and later upholding that decision on appeal.   *See supra* Section I.   In short, PATH found it suspicious that Plaintiff called the COVID-19 hotline to start a quarantine just hours after PATH denied his request for an alternative, "standby" work schedule the following week.   PATH then conducted surveillance that revealed, in the opinion of the head of its Office of Medical Services, that Plaintiff was not actually quarantining appropriately per PATH's requirements.   PATH therefore determined that Plaintiff had acted dishonestly in the situation, in violation of its rules. *Id.*  Indeed, PATH walked through the relevant facts and rationale in its motion briefing, explaining why it would have taken the same disciplinary action regardless of whether Plaintiff reported that he encountered a coworker who admittedly tested positive for COVID-19.   (Mov. Br. at 11–17).

In addressing this issue in his opposition, Plaintiff argues:

> **Mr. Gadmonski admitted that he told the OSHA investigator that if he had Plaintiff's doctor's notes from his doctor prior to the discipline, that might not lead to charges potentially!**   This fact renders Defendant's defense that it would have taken the same action against Plaintiff if he had not reported his goo[d] faith belief

14

that he was potentially exposed at work to someone (and his mother) who had COVID-19 under the analysis recently reiterated by the United States Supreme Court in [*Murray*].

(Opp. Br. at 8 (ECF pagination) (citations omitted, emphasis in original).  Plaintiff further argues: "If one thing is changed in this case, specifically Gregory Gadomski admitted if he had simply waited to get Plaintiff's doctor's notes from his doctor prior to the discipline, that it potential might not have lead to charges against the Plaintiff, it would have changed the outcome of this case." (*Id.* at 9 (ECF pagination)).  But the *Murray* analysis does not permit the Court to retroactively change *any* one fact and then gauge its impact on the outcome.  Rather, *Murray* requires the Court to change one *specific* fact—Plaintiff's engagement in a protected activity—when determining whether the employer would have imposed the same discipline.  601 U.S. at 38.  Plaintiff's presentation (or lack thereof) of a doctor's note is not a FRSA "protected activity."  Nor does Plaintiff suggest otherwise.  Rather, the only protected activity at issue in this case is Plaintiff's report of his interaction with a *co-worker on the job site* who had tested positive for COVID-19.  Indeed, the fact that Plaintiff had his exposure at work as opposed to, for instance, at the supermarket or anywhere else on the planet is the only reason why Plaintiff's call to PATH's COVID-19 hotline arguably implicates FRSA.

The correct hypothetical, therefore, requires the court to change only that single variable – that Plaintiff reported having been exposed to COVID-19 while *at work*—while leaving all other facts identical.  In this hypothetical, rather than encountering Mr. Isla in the locker room, Plaintiff instead received a telephone call from a non-coworker with whom Plaintiff recently had a brief, in-person encounter.  The person informed Plaintiff that he and his mother had tested positive for COVID-19.  Plaintiff then called Mr. Bing to inform him of that exposure (and to request to work a "stand by" schedule the following week), and otherwise acted identically as he did in this case.

15

The undisputed facts reflect that this hypothetical situation would have played out just as it did in reality, with the same reason for suspicion (i.e., Plaintiff calling to begin a COVID-19 quarantine after being denied a "standby" work schedule), the same bases for PATH's charges of dishonesty (e.g., the investigator's surveillance) and, ultimately, the same outcome.  Plaintiff has not directed the Court to any facts (whether disputed or not) to suggest otherwise.  Thus, the Court finds that PATH has shown, by clear and convincing evidence, that it would have imposed the same discipline against Plaintiff in the absence of his alleged protected activity.  No reasonable juror could find otherwise based on the undisputed facts in the motion record.  PATH is therefore entitled to summary judgment.

As the Court finds that PATH is entitled to summary judgment as described herein, it need not reach PATH's arguments that Plaintiff failed to establish various other elements of his FRSA retaliation claim.

## V.    CONCLUSION

Based on the foregoing, PATH's Motion, (D.E. No. 26), is **GRANTED**.

An appropriate Order follows this Opinion.

<u>*s/ Esther Salas*</u>
**Esther Salas, U.S.D.J.**

**Date:** March 30, 2026

Cc:    Hon. Leda D. Wettre, U.S.M.J.